DocuSign Envelope ID: A5813A09-6B33-447F-8D62-86AB3B29720A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SG BLOCKS, INC.,

                     **JURY TRIAL DEMANDED**

          Plaintiff,

-vs-

                     Civil Action No. 21-1990

OSANG HEALTHCARE COMPANY, LTD.

                     **COMPLAINT**

          Defendant.

Plaintiff, SG BLOCKS, INC. ("Plaintiff" or "SG Blocks"), by its undersigned counsel and for its Complaint against the defendant, Osang Healthcare Company, Ltd., states and alleges as follows:

### Statement of the Case

1.      SG Blocks brings this action to recover no less than $2 million in damages and, depending on what is learned in discovery, reasonably believed to be as much as $12 million - $15 million, resulting from Osang's intentional breach of contract and bad faith, material misrepresentations and fraudulent inducement, in connection with a certain Managed Supply Agreement (together with Addendum 1, PO Ref# OHCSGBX-10-14-2020, and Addendum 2, Memorandum of Understanding, the "MSA") entered into between the parties on October 12, 2020. A copy of the MSA is attached hereto as **Exhibit 1** and the contents thereof are incorporated herein by reference. The MSA obligated SG Blocks, at significant expense and commitment of resources, to undertake the consignment and distribution of two million (2,000,000) units of the "flagship Genefinder Plus RealAmp Covid-19 PCR Tests" manufactured by Osang (the "Covid-19 Test") at a cost of $9.00 per test to SG Blocks. Based upon Osang's representations SG Blocks accepted on consignment from Osang 2 million Covid-19 Tests (hereafter referred to as the

"Consigned Product") and accepted responsibility for and arranged at its costs to have them professionally maintained and stored at a temperature of -20 C (negative twenty degrees Celsius ) at a wholesale facility in Simi Valley, CA.  In order to induce SG Blocks to accept the Consigned Product,  just days prior to the execution of the MSA Osang provided to SG Blocks a document it labeled as "Strictly Confidential" and which it titled:

> **OSANG Healthcare**
> Direct Sales & Sales via Distributors
> North and South America
>
> - **Key Current Accounts as of Oct-8th 2020**
> - **CLOSED DEALS ONLY**

*See* **Exhibit 2** hereto, which is incorporated herein by reference and hereinafter referred to as the "Confirmation of Sales Orders". Specifically, in the Confirmation of Sales Orders Osang represented to SG Blocks that it had secured, as of that date, i.e. October 8, 2020, confirmed orders for the sale of no less than 8,150,000 Covid-19 Tests[1], either directly or through its authorized distributors, all of which, under the MSA, were required to be satisfied by and from the Consigned Product. Moreover, with respect to the aggregate sale of the 4 million Covid-19 Tests it was then trying to induce SG Blocks to take on consignment, Osang, as of October 8, 2020 and by way of the Confirmation of Sales Orders, represented to SG Blocks that:

> **"Even with existing orders and commitments – not including the extensive pipeline of pending deals that Osang and Distributors have - there is clear visibility and certainty on selling the proposed inventory of 4 million tests in the pipeline."[2]**

---

[1] From no less than 26 distinct purchasers, which included numerous major U.S. hospitals and medical labs, the State of Alaska, Walmart and many foreign governments including Mexico, Argentina, Brazil, Paraguay and Colombia. *See* **Exhibit 2**

[2] Osang was pushing for SG Blocks to accept 4 million Covid-19 Tests on consignment but the MSA reduced that amount to 2 million.

DocuSign Envelope ID: A5813A09-6B33-447F-8D62-86AB3B29720A

Notwithstanding a contractual duty to use "best efforts" to sell the Consigned Product Osang failed secure or effectuate the sale of a single Covid-19 Test. The representation by Osang that it had in excess of 8.15 million confirmed sales orders for Covid-19 Tests, either directly or through its distributors, and that the fulfillment of same from the Consigned Product was a "certainty," was a material representation of a (then) present fact that was knowingly false and fraudulent, and which operated, by design, to induce SG Blocks to enter into the MSA to its substantial detriment and loss. At the time it entered into the MSA Osang had no intention of fulfilling its obligations and promises it undertook to perform under the MSA. Had Osang performed under the MSA as it was bound to SG Blocks would have realized between $2 million and $12 million in profits from that part of the MSA alone.

## JURISDICTION

2.      Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a)(2), because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of a State and citizens of a foreign state.

## VENUE

3.      Venue is proper in this district under 28 U.S.C. § 1391(a)(1) because the substantial part of the events or omissions giving rise to the claims herein occurred in this district, and/or a substantial part of property that is the subject of the action is also situated in this district. Venue is also appropriate in this District under Paragraph 14(e) of the MSA, under which the parties agreed that "The state or federal courts located in Brooklyn, New York are the agreed-upon forum for the resolution of all disputes arising hereunder, and the Parties hereto, their officers, and employees hereby consent to (i) the jurisdiction and venue of the aforesaid courts for the purpose of resolving all such disputes and (ii) service of process by registered mail, return receipt requested, or any other manner consistent with federal or New York laws. A copy of the MSA is attached as **Exhibit 1** hereto and incorporated herein by reference.

## PARTIES

4.      Plaintiff is a publicly traded Delaware corporation with its principal place of business at 195 Montague Street, Brooklyn, New York.

5.      Plaintiff is a leading designer, innovator and fabricator of container-based structures that have received application to a wide variety of commercial and consumer uses, including residential housing, retail, hospitality, office buildings, medical and healthcare (clinical labs), and electric vehicle charging stations, as well as military applications.  SG Blocks trades on NASDAQ under the symbol SGBX.

6.      Defendant Osang Healthcare Company, Co., Ltd. ("Defendant" or "Osang") is a Korean company with its principal place of business located at 132, Anyangcheondong-ro, Dongan-gu, Anyang-si, Gyeonggi-do, 14040, Seoul, Republic of Korea.

7.      Osang is a manufacturer of medical diagnostic point-of-care tests and devices, including molecular/gene-based tests as well as other immunological and electro-chemical diagnostics devices, including molecular/gene-based tests (including the aforementioned Covid-19 Test) as well as other immunological and electro-chemical diagnostics devices.

### Factual Background

8.      In or about March 2020 SG Blocks was introduced to Osang by Peter Holden ("Holden"), Osang's Senior International Advisor.

9.      At all times material hereto Holden was an authorized representative of Osang.

10.     Upon information and belief Holden is the principal of Dunworth Capital and resides and works in Greenwich, Connecticut.

11.     By email dated March 22, 2020, Holden wrote to SG Blocks' investment advisors and confirmed that Osang was interested in pursuing a transaction with SG Blocks, stating:

DocuSign Envelope ID: A5813A09-6B33-447F-8D62-86AB3B29720A

Just spoken again with Chairman Lee at Osang and he's very interested to move forward if this is something we can get done quickly.

Can you please provide more details on process /timelines steps from sending an LOI to gaining 80+% stake in SG Blocks assuming that all costs would be covered by SG Blocks and, in exchange, Osang would route all sales/marketing and revenues through the vehicle.

A copy of Holden's March 22, 2020 email is attached hereto as **Exhibit 3.**

12.     On April 2, 2020, Holden, in his capacity as Senior International Advisor of Osang, wrote to Paul Galvin, Chairman and CEO of SG Blocks ("Galvin"), and said the following about Osang's Covid-19 Test and the parties execution of a memorandum of agreement regarding the U.S. distribution thereof:

We just heard from the FDA tonight that they'll be posting (finally!) the EUA certification tomorrow. I spoke to Chairman Lee and if we can get this signed, we can do a simultaneous announcement of SGB deal plus EUA…

A copy of Holden's April 2, 2020 email is attached hereto as **Exhibit 4.**

13.     On or about April 5, 2020, as SG Blocks and Osang were negotiating the terms of a to be formed business relationship, Holden, in his capacity as Senior International Advisor of Osang, represented to SG Blocks that there is "No way in hell SG blocks can handle all the inquiries. 100 inquiries a day. So much business there."

14.     At all times material hereto Osang represented to SG Blocks that the Covid-19 Test received emergency use authorization from the United States Food and Drug Administration.

15.     On or about April 28, 2020, Osang and SG Blocks entered into a Distributorship Agreement (the "Distributorship Agreement") whereby SG Blocks became an authorized distributor of the Covid-19 Test in the United States. A copy of the Distributorship Agreement is attached hereto as **Exhibit 5**.

16.     During the negotiations concerning the Distributorship Agreement Osang and Holden made reference to the fact that Osang was preparing an initial public offering of its stock on KOSDAQ,

*to wit*, the Korean Securities Dealers Automated Quotations, a trading board of Korea Exchange (KRX) in South Korea.

17.     On May 1, 2020, SG Blocks, at Osang's request, granted Osang a right of participation in future financings of SG Blocks provided further that Osang provide customer referrals to SG Blocks for the purchase under the Distributorship Agreement of Products resulting in at least $5,000,000 of revenue to SG Blocks. *See* **Exhibit 6** hereto.

18.     On May 10, 2020, in connection with and in furtherance of the Distributorship Agreement, Osang provided SG Blocks with a Powerpoint presentation entitled "**GeneFinder™ COVID-19 Plus PCR Test:** Overview & Competitive Advantages," wherein Osang represented, *inter alia*, that it was able to "manufacture and supply 1.5 Million tests a DAY" and had already sold "tens of millions of tests to…governments worldwide," including to the following"

- FEMA (US)
- NHS (UK)
- Ministry of Health (ITALY)
- Ministry of Health ( France )
- Ministry of Health ( Spain)
- Ministry of Health ( Germany)
- Government of Argentina
- Government of Morocco
- Government of Bulgaria
- Ministry of Health, Kuwait
- State of Sao Paolo, Brazil
- Ministry of Health, Russia
- Department of Defense, USA
- National Institute of Health, USA
- State of Sao Paulo, Brazil

*See* **Exhibit 7**, at slides 5, 23-24.

19.     In connection with and pursuant to the Distributorship Agreement SG Blocks engaged internationally acclaimed architectural and industrial design firm Grimshaw (www.grimshaw.global) to design a suite of prefabricated health facilities for on-site, mobile COVID-19 testing. On May 28, 2020

and June 2, 2020, respectively, SG Blocks, Grimshaw, and Osang publicly announced the launching of their partnership whereby Grimshaw undertook to design the so-called "D-Tec" suite of container based structures. *See* attached **Exhibit 8** (SG Blocks announcement) and **Exhibit 9** (Grimshaw announcement) which are incorporated herein by reference.

20.     Osang approved both the SG Blocks announcement (Exhibit 8) and the Grimshaw announcement (Exhibit 9).

21.     About the partnership with Grimshaw and SG Blocks Dong-Hyun Lee ("Lee"), Chairman & Chief Executive Officer of Osang, stated:

> "We view SG Blocks and Grimshaw as ideal partners to broaden distribution of our advanced tests and expand our ability to directly address this global pandemic in the USA. Our pipeline is substantial, we believe Grimshaw's commitment to sustainable, flexible design solutions combined with SG Blocks modular construction expertise has the ability to address logistical challenges."

*See* **Exhibits 8** and **9**, respectively.

22.     On or about June 18, 2020, Osang submitted a proposal to SG Blocks (the "June 2020 Proposal") whereby Osang proffered to make SG Blocks a "regional USA Hub" for the sale of the Covid-19 Test under the following conditions:

    (i)     SGB had to agree to purchase a minimum of 2 million tests at a "highly favorable rate" of $8/test i.e. $16,000,000

    (ii)    Osang would invoice SGB for 4 million tests, i.e. $32,000,000 as follows:

        • 50% paid at Closing ( i.e. $16 Million )
        • 50% paid within 90-120 days of Closing

A copy of the June 2020 Proposal is attached hereto as **Exhibit 10** and incorporated herein by reference. *See* p. 4.

23.     To induce SG Blocks to accept the June 2020 Proposal Osang promised to ensure that "all of its USA distributors purchase via SGB as well as direct sales itself." *See* June 2020 Proposal at p. 4.

24.     As a further inducement Osang proposed a "3 Tier Pricing Structure" whereby (i) "Osang will route all direct smaller USA purchases through SGB at a price of $9.0 / test FoB," (ii) "SGB will agree to resell to other USA distributors, and USA distributors will agree to order via SGB, at the same distributor prices previously agreed with Osang (ranging from $12-$18 dollars)" and (iii) "SGB can sell to other third parties at whatever price it wishes. *See* June 2020 Proposal at p. 3.

25.     As a further inducement to get SG Blocks to accept the June 2020 Proposal Osang represented that "SGB may also leverage the SGB Hub Inventory for sales to South America and Canada on an opportunistic basis on leads generated by SGB directly." *See* June 2020 Proposal at p. 3.

26.     About the June 2020 Proposal Osang represented to SG Blocks that "This is a unique opportunity for SGB but must be Closed and Shipped (Bill of Lading) before **June 30th 2020**" because "**Osang is doing it to make numbers**."  *See* June 2020 Proposal at p. 4 (emphasis added).

27.     On June 19, 2020, to further induce SG Blocks to accept the June 2020 Proposal Osang provided SG Blocks with a purported purchase order for $1,050,000 (1,000 test kits at $10.50 per test) issued to Osang by National One Medical Supplies LLC located in Dubai, UAE (hereafter the "UAE PO"). A copy of UAE PO is attached hereto as **Exhibit 11** and incorporated herein by reference.

28.     In his June 19, 2020 email to which the UAE PO was attached Holden wrote "First of 7 million unit order from UAE for the confidential companies in the USA I mentioned on the phone. Osang have confirmed this will be routed through the SGB HUB." A copy of Holden's June 19, 2020 email is attached hereto as **Exhibit 12** and incorporated herein by reference.

29.     Upon information and belief the UAE PO was fraudulent and fabricated in order to induce SG Blocks to purchase 2 million Covid-19 Tests for $16,000,000.

30.     By email dated June 23, 2020 at 10:39 a.m, Osang represented to SG Blocks that it was "absolutely jammed fulfilling orders" and that it was "directing all US distributors to route their smaller

DocuSign Envelope ID: A5813A09-6B33-447F-8D62-86AB3B29720A

orders through SGB as a regional hub so there's nothing more they can do other than for SGB to get this done before June 30th." *See* **Exhibit 13**, the contents of which are incorporated herein by reference.

31.    In order to induce SG Blocks to agree to the June 2020 Proposal, Osang directed Holden to represent to SG Blocks that Holden has "25 year relationship of successful business and trust with Osang executives and this is why we are where we are today with SG Blocks – this opportunity has not been offered to anybody else in the USA which is fast becoming the largest market for Osang in the world." *See* **Exhibit 13**.

32.    Osang revised its demand that SG Blocks purchase 2 million tests at closing, instead only insisting on 1 million (i.e. $8,000,000). Holden suggested that SG Blocks could pay for the 1 million tests "from treasury with no debt."  *See* Holden's June 23, 2020 (@ 8:17 p.m.) email attached hereto as **Exhibit 14** and incorporated herein by reference. About the revised terms Holden represented that "As discussed, here is what Chairman Lee of  Osang has conceded in the interests of expediting a deal given we only have 1-2 days to lock this in. I have no more favor chips to draw down – we need to execute." *See* **Exhibit 14**.

33.    On June 24, 2020, Galvin wrote to Osang and stated the following:

> After completing what due diligence can be done, <u>there is only one PO for $24,000 and it is undated.</u>
>
> I am now a little frustrated,  you cannot get us an order and that is a major concern for me.
>
> This is your responsibility ….  Our job was to raise the money to Fill the OSANG orders.  Where are they?
>
> MY BOD is pissed off because nothing is actually signed …  they feel you are doing a bait and switch (i.e. fill these orders by repurchasing vs buy these on spec)
>
> We would need a full on confession of judgment from OSANG to consider … for the repay …. Written & filed to our liking.

> If this is that important to OSANG - get us an order from anywhere in the world - real business.
>
> I am free at 930 … did not sleep a wink with this pressure.

A copy of Galvin's June 24, 2020 email is attached hereto as **Exhibit 15** and incorporated herein by reference.

34.     On June 24, 2020 Galvin informed Osang that SG Blocks would not move forward with the transaction that Osang had proposed, as modified.

35.     On June 25, 2020 Holden wrote Galvin and other members of SG Blocks' team and tried to resurrect the deal, stating "I worked with Osang until the wee hours this morning and we have found a solution on shipping that will allow us still to do the Hub deal if we want as it buys us another 1-2 days." A copy of Holden's June 25, 2020 email is attached hereto as **Exhibit 16** and incorporated herein by reference.

36.     Throughout the negotiations concerning the June 2020 Proposal Holden repeatedly stated to SG Blocks' principals on the deal, including Galvin and SG Blocks' Acting Chief Financial Officer Gerald Sheeran ("Sheeran"), that Osang needed to do the deal by June 30, 2020 and issue a purchase order to SG Blocks in the amount of $32 million, "to make their numbers" and to achieve "revenue recognition."

37.     On June 25, 2020 SG Blocks rejected the revised offer from Osang.

### OSANG FRAUDULENTLY INDUCED SG BLOCKS TO ENTER INTO THE MANAGED SUPPLY AGREEMENT

38.     On October 6, 2020 Holden wrote to Galvin with a new proposal from Osang. Specifically, Osang proposed to have SG Blocks establish a manufacturing facility in the United States to produce and distribute the Osang Covid-19 Test, and new variations and modifications thereof, and to have SG Blocks be a U.S./Canada "Hub" for the distribution and sale of all Covid-19 Tests.  In exchange for "giving" SG Blocks "this business" Holden wrote that:

Osang wants something in return. It wants SGB or SGB Clarity JV to be the 'custodian' of 4 million regular tests as a hub for north America on existing deals t greatly reduce shipping costs and uncertainty for these customers. The custodian means that SGB/Clarity will get a management fee for hosting plus don't pay anything up front – Osang will pay for shipping costs and advance the product at no cost, but that SGB/Clarity and Osang and all other distributors try on a 'best efforts' basis to sell down this inventory. Whatever is left over after X months is bought back by Osang. **This will also help Osang make their numbers** but the liability sticks with them." (emphasis added)

A copy of Holden's October 6, 2020 email is attached hereto as **Exhibit 17** and incorporated herein by reference.

39.     Holden represented to Galvin that "there are 4 other bidders – AHM, NEXUS, ELITECH AND THERMOFISHER and I persuaded Osang chairman it should be SGB/Clarity…" *See* **Exhibit 17**.

40.     Shortly after sending the aforementioned email on October 6, 2020, Holden provided Galvin with a document labeled "Strictly Confidential" and captioned "**OSANG Healthcare Co. Ltd.** Proposal to SG Blocks–N.A. Manufacturing & Logistics," which proposed the formation of a U.S. based joint venture to be named SG-Osang LLC to be owned 51% by SG Blocks and 49% by Osang (hereafter referred to as the "Osang JV and Consignment Proposal").     A copy of Osang JV and Consignment Proposal is attached hereto as **Exhibit 18** and incorporated herein by reference.

41.     In the Osang JV and Consignment Proposal, to induce SG Blocks, Osang represented that under the proposed arrangement "**Other distributors (inc. Osang direct sales ) all become customers**" of SG Blocks, thereby creating "**less competition."** *See* Osang JV and Consignment Proposal, p. 4.

42.     The Osang JV and Consignment Proposal further provided that:

"Osang will consign **four (4) million Osang Genefinder tests** to SGB to manage on an outsourced basis. This reduces significantly the costs, delays and complexity of shipping to North and South American distributors and direct customers from Seoul."

*See* Osang JV and Consignment Proposal, p. 7.

43.     To further induce SG Blocks Osang further represented that (i) it "warrants that all sales from North/South America will be routed throughout this Hub managed by SGB," (ii) For Direct Sales

made by SG Blocks from Hub inventory, SGB will get a distributor price of $9 dollars and may sell at whatever retail price it sees as appropriate, and (iii) "For Sales to other OsangNorth/South America distributors and/or direct Osang sales, SG Blocks will receive a fee of the greater of $1 / test OR the difference between $9 and the price charged to the third party." *See* Osang JV and Consignment Proposal, p. 7.

44.     To further induce SG Blocks Osang further promised the following rights to SG Blocks:

- "Exclusive manufacturing for N.A"; and
- "GB has option to purchase up to 2.5% of Osang's IPO premarket price" and
- "First rights on the manufacture of future Osang products."

*See* Osang JV and Consignment Proposal, p. 6.

45.     Osang added urgency to SG Blocks' acceptance stating "This transaction must be completed before end of October 2020 and the JV/Manufacturing rights is conditional on this." *See* Osang JV and Consignment Proposal, p. 7.

46.     To further induce SG Blocks to enter into a business transaction, which had at its core, the consignment to SG Blocks of $36 million worth of Osang's Covid-19 Tests, on October 8, 2020, Osang provided SG Blocks with the aforementioned Confirmation of Sales Orders (*see* p.1 infra; *see also* **Exhibit 2**), which made material representations of presently existing facts. Specifically, Osang made material representations about **both** Osang's direct pipeline of sales for the Covid-19 PCR Test ("Direct Pipeline"), and committed but yet to be fulfilled sales of same secured through its distributors AHM and Elitech ("Distributor Pipeline"). With respect to the Direct Pipeline, Osang represented to SGB that it had no less than 6-7 million "outstanding commitments" for sales of Covid-19 tests that were going to be satisfied from the Consigned Property. *See* Confirmation of Sales Orders, p. 3.

47.     Moreover, Osang further represented that of the outstanding commitments (from approximately 11 purchasers) virtually every purchaser[3] was identified as having a "100% probability" of making a repeat order. *See* Confirmation of Sales Orders, p. 3.

48.     In order to induce SG Blocks, Osang further represented to SGB that distributor AHM had received 1.4 million orders for Osang's Covid-19 PCR test, and out of that total commitment, 1,369,500 orders were unfulfilled and to be satisfied from the tests to be consigned to SG Blocks. Moreover, for each of the 13 purchasers that comprised AHM's sales orders, Osang represented a "high probability" of repeat orders. *See* Confirmation of Sales Orders, p. 4.

49.     In order to induce SG Blocks Osang further represented to SGB that with respect to its distributor Elitech it had an additional 750,000 outstanding orders that were to be satisfied from the tests to be consigned to SG Blocks. *See* Confirmation of Sales Orders, p. 5.

50.     Indeed, about the Direct Pipeline and the Distributor Pipeline Osang represented to SGB the following:

> **"Even with existing orders and commitments - not including the extensive pipeline of pending deals that Osang and Distributors have -  there is clear visibility and certainty on selling the proposed inventory of 4 million tests in the pipeline."**

*See* Confirmation of Sales Orders, p. 2.

51.     Just prior to the parties' execution of a managed supply agreement, which was entirely premised upon the representations made in both the Osang JV and Consignment Proposal and the Confirmation of Sales Orders, on October 12, 2020 Osang made a eleventh hour request to segregate out from the MSA the consignment of 4 million Covid-Tests (at $9/test for a total amount of $36 million) and

---

[3] Atlas Labs, State of Washington and RTC Medical were listed at a 95% probability of repeat orders and the State of Minas, Brazil was listed at 50% probability.

instead to issue to SG Blocks a purchase order reflecting the consignment of same. Specifically, Holden wrote to Galvin and said the following:

> Paul,
>
> Please take a look at the latest version of the MSA with the PO and MoA/JV agreements appended to this so all together. We had a curve-ball over the night that Osang legal insisted on the PO being a stand-alone document and show 90 days for revenue recognition requirements.

A copy of Holden's email dated October 12, 2020 is attached hereto as **Exhibit 19** and incorporated herein by reference.

52.    Holden further represented to Galvin that "Osang will open up Consignment to worldwide sales, not just those in Territory…" and concluded by stating that "Osang is committed to doing JV with SGB assuming we can get past the PO/MSA arrangement done. *See* **Exhibit 18**

53.    That so-called "curve-ball" Holden referenced in his October 12, 2020 email was actually an act of fraud (among many) on the part of Osang. It evinced Osang's true motives in the transaction, which had nothing whatsoever to do with forming a joint venture in good faith with SG Blocks (or anyone for that matter), but rather to fraudulently pad and manipulate its financial statements so as to make it appear that it had a separate purchase order and account receivable for $36 million (devoid of all the contingencies and terms set forth in the MSA which clearly established that the tests were not sold, but consigned) – all with the ultimate objective of increasing its IPO valuation and prospects.

54.    On or about October 12, 2020, SG Blocks and Osang entered into the aforementioned MSA (see p. 1 and **Exhibit 1**).

55.     Pursuant to the MSA SG Blocks agreed to receive on consignment from Osang two million (2,000,000) Covid-19 Test (defined in the MSA as the "Consignment") for subsequent sale and distribution to Osang's direct customers worldwide) (which included those referenced in the Confirmation of Sales Orders) and for sale and distribution by and through Osang's authorized distributors (which

included those referenced in the Confirmation of Sales Orders) in the United States and Canada. *See* MSA at p. 1.

56.     Pursuant to Section 3 of the MSA, entitled "**Priority,**" Osang was required to "use best efforts that all sales of Product in SGB Territory as well as OHC Non-Territory Sales, whether by it or its authorized distributors (hereinafter "Authorized Distributors"), will be drawn from Consignment with priority."

57.     Under Section 8 of the MSA, entitled "**Duties and Responsibilities,**" Osang "shall fulfill and render its duties and obligations to this Agreement in accordance with the terms thereof, including, but not limited to: (i) providing and managing the delivery and the safe handover of Consignment to Approved Vendor; (ii) managing OHC's Authorized Distributors in Territory, including their purchase of Product from Consignment and payment to SGB in a timely way; (iii) supporting SGB in the sales and marketing of Consignment in Territory and the promotion of SGB as its supplier in Territory up to the point when all of Consignment has been sold or committed to.

58.     Section 5 of the MSA provided for payment to SG Blocks as follows:

> OHC Driven Sales. For sales of aforementioned two (2) million Consignment Product made by  OHC directly to customers in Territory, or via its Authorized Distributors in Territory, SGB will receive a service fee of the greater of (i) $1 / test; or (ii) the difference between the SGB Distributor Price and the Market Price as sold by OHC or its Authorized Distributors.

59.     Upon information and belief Osang and the Authorized Distributors have been selling the Covid-19 Tests, on average, for $15.

60.     Addendum 1 to the MSA is a purchase order dated October 12, 2020 issued by SG Blocks to Osang for two million (2,000,000) Covid-19 Tests for a total amount of $18,000,000.

61.     SG Blocks' agreement to be bound by the MSA was conditioned upon Osang's good faith negotiation and execution of a joint venture consistent with the terms set forth in the Memorandum of Understanding ("MOA") attached to the MSA as Addendum 2.

62.     In pertinent part the MOA provides that:

> This Non-Binding Memorandum of Agreement ("MoA") outlines the preliminary understanding with respect to the proposed key terms and conditions of establishing a manufacturing facility in the USA serving the North America and South America Markets for current and future Osang products as memorialized herein. Parties agree to negotiate in good faith to complete definitive documentation within 30 days of the Effective Date of the MSA to which this MoA is appended.

63.     According to the MOA the "Parties shall negotiate in good faith US based joint venture agreement (the "Definitive Agreement") to manufacture Product in Territory ("Joint Venture"). The Definitive Agreement will provide that the Parties shall establish Joint Venture as a separate US based legal entity and manufacture Product according to the quality, performance and regulatory requirements as outlined in Addendum 1 - the RFP."

64.     On October 19, 2020, with the express consent and participation thereof by Osang, SG Blocks publicly announced (the "MSA Announcement") the execution of the MSA. In the announcement Lee made the following statements about the transaction and Osang's relationship with SG Blocks:

> "We are delighted with the SGB partnership and see this as a prelude to yet closer collaboration as we explore the expansion of operations and localized manufacturing in the USA," commented Dong-Hyun Lee, Chairman & Chief Executive Officer of OSANG Healthcare Co., Ltd. "This should greatly improve the speed and efficiency by which we roll-out exciting new products optimized for these markets - not least in the short-term our combination Covid-19/Influenza A&B Test which the US Government has deemed of critical importance as we move into the winter season."

A copy of the MSA Announcement is attached hereto as **Exhibit 20** and incorporated herein by reference.

65.     Lee further consented to the following public statement concerning the MSA and MOU:

It is expected that the partnership will enable a much more efficient supply-chain arrangement for OSANG tests, not just for SG Blocks customers but also as a regional distribution hub for pre-existing OSANG customers, including FEMA and large lab and hospital networks, significantly reducing the costs and delivery times.

66.     On or about October 21, 2020 SG Blocks provided a draft joint venture agreement ("Draft JVA") to Osang, a copy of which is attached hereto as **Exhibit 21**.

67.     The terms set forth in the Draft JVA are consistent with the terms set forth in the MOA.

68.     Osang has failed to provide any written comments or response to the Draft JVA.

69.     Osang has failed to provide any substantive comments or response to the Draft JVA.

70.     Since the execution of the MSA and MOA Osang has never asserted that the Draft JVA was inconsistent with the terms set forth in the MOA.

71.     Osang has failed to negotiate in good faith the definitive documentation for the parties' joint venture.

72.     On or about October 14, 2020, Osang advised SG Blocks that it had shipped the Consigned Covid-19 Tests.

73.     Shortly after Osang notified SG Blocks of the shipment the Consigned Covid-19 Tests were received by SG Blocks professional storage and maintenance consultant Liberty Distribution, located at Simi Valley, California.

74.     After the MSA was executed on October 12, 2020, Osang made no effort to sell the Consigned Product, including by the fulfillment of the Direct Pipeline orders of 6-7 million "outstanding commitments" it purportedly had as of the date of execution of the MSA.

75.     After the MSA was executed on October 12, 2020, Osang made no effort to ensure that its Authorized Distributor AHM fulfilled its purported 1.4 million in orders for Covid-19 Tests from the Consigned Product.

DocuSign Envelope ID: AE813A09-6B33-447F-8D62-86A83B20720A

76.     After the MSA was executed on October 12, 2020, Osang made no effort to ensure that its Authorized Distributor Elitech fulfilled its purported 750,000 in orders for Covid-19 Tests from the Consigned Product.

77.     After the MSA was executed, Osang made no effort to ensure and/or realize that all sales of Product in SGB Territory as well as OHC Non-Territory Sales, whether by it or its Authorized Distributors, would be drawn from Consignment with priority.

78.     After the MSA was executed on October 12, 2020, Osang failed to communicate in good faith with SG Blocks concerning the status of its efforts to sell the Consigned Covid-19 Tests, either directly through its Direct Pipeline, or through the Distributor Pipeline.

79.     With no communication and no fulfilled orders, or any good faith effort from Osang whatsoever, on November 19, 2020, Galvin wrote to Holden and demanded that Osang honor and perform its contractual obligations, stating:

> Peter,
>
> It has been nearly a month we agreed to become the exclusive order fulfillment arm of OSANG in North America.
>
> You provided a lengthy schedule of recurring clients and orders to be filed immediately as they were recurring.
>
> IT IS NEARLY ONE MONTH AND WE HAVENT BEEN ASKED TO FILL A SINGLE TEST ORDER.
>
> The Board of SG is very concerned.
>
> We need definitive orders today Peter or we will be reaching out to our     colleagues at OSANG directly.

A copy of Galvin's November 19, 2020 email to Holden is attached hereto as **Exhibit 22** and incorporated herein

by reference.

80.    On November 19, 2020, Galvin sent a second email to Holden raising concerns about Osang's

complete failure to respond to the Draft JVA (or to otherwise negotiate in good faith), which had been

furnished a month earlier, stating "it is terrible form of OSANG to fail to respond to the OA draft we

rushed out the door. This relationship has been a one way street." *See* **Exhibit 22** attached hereto and

incorporated herein by reference.

81.    On November 23, 2020, Sheeran requested that Osang provide the "contact information

for **ALL** key OSANG accounts and leads including, but not limited to, the list of accounts attached in

"OHC Sales Accounts" PowerPoint presentation?" i.e. the Confirmation of Sales Orders. *See* **Exhibit 23**

attached hereto and incorporated herein by reference.

82.    On behalf of Osang Holden responded to Sheeran's November 23, 2020 stating that the

information Sheeran was requesting was "confidential" and refused to provide it, to which Sheeran

responded as follows:

> As being a publicly traded company, we have already announced the distribution
> agreement with Osang but have shown $0 sales to date on the consignment/distribution
> orders. I am confused on your statement that we need to contact Osang directly as you
> have been the point of contact and representative for all other matters. Just to clarify – we
> need to make the data request directly to Mr. Cho?
>
> How can we, SG Blocks, fulfill orders in our stated Territory and other non-territories if
> we are not provided contact information on the key accounts from Osang's side? We need
> to know which accounts are in our territory so our Sales team can start chasing leads and
> selling the test kits in storage. Section 8 (b) (ii) and (iii) of the distribution agreement states
> "OHC shall manage OHC's Authorized Distributors in Territory, including their purchase
> of Product from Consignment and payment to SGB in timely way; and support SGB in the
> sales and marketing of Consignment in Territory and the promotion of SGB as it supplier
> in Territory up to the point when all Consignment has been sold or committed to".
>
> The request for the additional data (contract information, leads, historical sales) will
> support our sales and marketing team. Again, I kindly ask for the additional contact
> information that was presented in the sales pipeline attached and the historical sales report
> for our Territory so we can start fulfilling orders. Let me know who we should contact at
> Osang if either Mr. Cho or yourself can't accommodate this request.

*See* **Exhibit 23** attached hereto and incorporated herein by reference.

83.     On November 24, 2020, Sheeran emailed Sam Cho ("Sam Cho"), Executive Vice-President and Chief Marketing Officer of Osang, and Holden, and once again demanded that Osang act in good faith and cooperate with respect to its obligations under the MSA, including Osang's duty to effectuate the sale of the Consigned Product from the Direct Pipeline and the Distributor Pipeline, stating:

> I have now asked for the third time, how can we fulfil orders if we not allowed basic information on key accounts within our defined Territory?
>
> You provided the "strictly confidential" sales pipeline to us in order to help close the distribution agreement and ship the 2 million test before Osang quarter-end.  We accepted the tests under the premise that tests were being fulfilled on a weekly, bi-weekly, and monthly basis from the key accounts list below.
>
> To date, we have received zero tests to fulfill and we (SG Blocks) are not waiting for another 6 weeks of non-test sales.  Hence the request for sales data and account information from Osang.
>
> All that we are asking for is that OSANG shares basic information on existing sales and account information so our team can start chasing these leads.
>
> I requested the data from Mr. Cho as requested and received no feedback or email response from Osang on this request.
>
> Please advise if the sales data and account information will be or will not be shared.

*See* **Exhibit 24** attached hereto and incorporated herein by reference.

83.     Osang failed to respond to Sheeran's November 24, 2020 email (Exhibit 24).

84.     By refusing to respond to Sheeran's legitimate inquiries and demands Osang withheld the benefits due to SG Blocks under the MSA and otherwise acted in bad faith.

85.     On November 24, 2020, Galvin sent another email to Osang demanding that it fulfill its obligations under the MSA, stating:

> Peter,
>
> On behalf of SGBX, we need to know NOW if there are any recurring orders to be filled from our managed supply agreement.

Time is up, we expect a answer by noon EST.

You have been dancing from May

No answer is an answer.

*See* **Exhibit 25** attached hereto and incorporated herein by reference.

86.    In response to Galvin's demand, Osang, by Holden, responded as follows:

Osang Healthcare has several one-time and recurring deal opportunities via third party distributors. While I am not party to these discussions, and they are confidential between Osang and the third party, Osang has pledged that when such transactions conclude, Osang will make every effort and give priority to fulfil these orders through SGBX as per the wording of the contract signed between parties. Given the pipeline, there is every confidence that the 2 million tests will be very quickly sold and, notwithstanding, Osang is obligated to purchase back any unsold inventory after a certain defined period of time.

*See* Exhibit 25.

87.    Since the MSA was executed on October 12, 2020, and since Holden's email dated November 24, 2020, not a single Covid-19 test has been sold through the Direct Pipeline or the Distributor Pipeline.

88.    In or about December 21, 2020, while it was contractually bound to SG Blocks under the MSA and MOA, Osang announced that it had entered into a "Manufacturing and Supply Agreement" with Nexus Dx, Inc. ("Nexus"), for the manufacture and sale of the Osang's "GeneFinder® COVID-19 Plus RealAmp Kit," i.e. the aforementioned Covid-19 Test. *See* **Exhibit 26**; see also https://www.nexus-dx.com/wp-content/uploads/2020/12/OSANG-Healthcare-Co.pdf

89.    About its partnership with Nexus Lee said the following:

"We are delighted with the partnership and see this as a prelude to yet closer collaboration as we explore the expansion of operations and localized manufacturing in the USA," commented Dong-Hyun Lee, Chairman and Chief Executive Officer of OSANG Healthcare Co., Ltd. "This should greatly improve the speed and efficiency by which we roll-out exciting new products optimized for these markets - not least in the short-term our combination COVID-19/Influenza A&B Test which the US Government has deemed of critical importance as we move into the winter season."

About its partnership with Osang, Nam Shin, Chief Executive Officer of Nexus, said the following:

> "We are pleased to venture our partnership with OSANG, utilizing our US manufacturing facility, which should allow us to help distribution of OSANG's advanced tests to address this urgent and rapidly increasing demand for global pandemic."

*See* **Exhibit 26**

90.     SG Blocks' repeated requests that Osang honor and fulfill its obligations under the MSA were deliberately ignored. Accordingly, on February 14, 2021, Galvin wrote to Sam Cho and stated:

> Once again it seems you contact us only when you need something. Nothing more.
>
> **There has been no follow up to anything we discussed almost one month ago.**
>
> We are tired of being manipulated.
>
> FTR, we have not received a single order from Holden, Cho or OSANG since May 4.
>
> And we were lied to by Peter Holden … he stated OSANG had existing orders that would be fulfilled from the 2,000,000 tests in Ca. He stated they would be gone in 90 days or less. NOT ONE TEST WAS SOLD BY OSANG.
>
> You know this but do not care – you only care about OSANG's and its revenue recognition.
>
> You obsess about your job ….. but nobody else's job matters to you.
>
> Sam, you have not invested one ounce of sincerity into our relationship.
>
> Your calls & visits were only about trying to book revenue, not grow a relationship.

*See* **Exhibit 27** attached hereto and incorporated herein by reference.

91.     On February 17, 2021, EuSeop Lee, Senior Managing Director of Osang, informed Galvin that Sam Cho resigned "due to the recent issues." Mr. Lee further expressed a purported interest in "restore[ing] this relationship." *See* **Exhibit 28** attached hereto and incorporated herein by reference.

92.     Galvin responded to EuSeop Lee by providing a copy of the Confirmation of Sales

Orders and asked him to confirm that they were in fact bona fide sales orders. *See* **Exhibit 28.**

93.     EuSeop Lee failed to confirm the legitimacy and validity of the sales orders set forth in

the Confirmation of Sales Orders.

94.     On February 24, 2021 SG Blocks issued a notice of breach ("Notice of Breach) to Osang

and demanded that  Osang 1) cease and desist from breaching its contractual obligations under the MSA;

2) use its best efforts such that all sales of product in the SGB Territory, as well as OHC Non-Territory

sales, whether by it or its Authorized Distributors will be drawn from Consignment with Priority and 3)

immediately provide SG Blocks with an actual (not phony) $34,000,000 sales pipeline for the Consigned

products.

95.     Osang has failed to respond to the Notice of Breach and has otherwise failed to cure the

same.

96.     On or about January 21, 2021, Osang caused it auditors in connection with its IPO on the

KOSDAQ, KPMG, to write to SG Blocks to solicit its complicity and participation in a fraudulent financial

reporting scheme that Osang was engaged in. Notwithstanding the actual knowledge that the Covid-19

Tests that were the subject of the October 12, 2020 Purchase Order (Addendum 1 to the MSA), i.e. the

Consigned Product, were not purchased by SG Blocks but instead were, in fact, only consigned to SG

Blocks, Osang used KPMG as a vehicle to effectuate a false financial reporting and securities fraud in

connection with its upcoming IPO by having KPMG send SG Blocks a form purporting to "confirm" that

the Consigned Covid-19 Tests were purchased by SG Blocks and therefore recognizable as an account

receivable on Osang's financial statements. Attached hereto as **Exhibit 29** and incorporated herein is an

email dated January 25, 2021, from Hyeonu Han, Industrial Market 1 / KICPA, KPMG Samjong

Accounting Corp, wherein the improper inquiry was made concerning the nature of the Consigned

Product. Attached to the January 25, 2021 email from Hyeonu Han was an "Urgent" "Confirmation Request" ("Confirmation Request") wherein Osang and KPMG fraudulently requested that SG Blocks confirm that it owed an account receivable to Osang in the amount of $18,000,000. A copy of the Confirmation Request is attached as **Exhibit 30** and incorporated herein.

97.     At all times material hereto Osang knew that the Consigned Product was in fact consigned to SG Blocks, not purchased by SG Blocks, and that there was no basis according to generally accepted accounting principles to even suggest that the Purchase Order constituted an account receivable.

98.     Upon information and belief, Osang, utilizing its auditor KPMG, sought to falsify its financial accounts concerning the Consigned Product in order to deceive the Korean securities regulators, and to otherwise manipulate its IPO.

99.     SG Blocks refused to participate or be complicit in Osang's scheme to commit accounting and securities fraud.

100.     On February 9, 2021, Sam Cho wrote to Sheeran and pressured him to falsely verify that SG Blocks had purchased the Consigned Product, stating:

> "KPMG is on standby in our office waiting for the Audit Confirmation. Your cooperation will be greatly appreciated and please notify me when it has been sent."

101.     On February 10, 2021, SG Blocks returned the aforementioned form to KPMG confirming that the Consigned Product was not purchased by SG Blocks, but only consigned to it.  *See* **Exhibit 31** hereto which is incorporated herein by reference.

## FIRST COUNT
### (BREACH OF CONTRACT)

102.     Plaintiff realleges paragraphs 1 through 101 as if repeated verbatim herein.

103.     SG Blocks and Osang formally executed the MSA, which constitutes a legally binding and enforceable contract.

104.    SG Blocks has performed and fulfilled its obligations under the MSA.

105.    Osang has materially breached the MSA by, among other things,

    (i)    failing to use its best efforts that all sales of Product in SGB Territory as well as Osang Non-Territory Sales, whether by it or its authorized distributors, would be drawn from Consignment with priority," in breach of Section 3 of the MSA;

    (ii)   failing to manage the Authorized Distributors in Territory, including their purchase of Product from Consignment and payment to SGB in a timely way, in breach of Section 8 of the MSA;

    (iii)  failing to support the Authorized Distributors in Territory, including their purchase of Product from Consignment and payment to SGB in a timely way, in breach of Section 8 of the MSA;

    (iv)   failing to support SGB in the sales and marketing of Consignment in the Territory and the promotion of SGB as its supplier in Territory up to the point when all of Consignment has been sold or committed to, in breach of Section 8 of the MSA;

    (v)    failing to fulfill and render its duties and obligations under the MSA in accordance with the terms thereof;

    (vi)   failing to negotiate in good faith the definitive documentation for the establishment of a manufacturing facility in the USA for the manufacture and distribution of current and future Osang products to the North America and South America Markets, within 30 days of the Effective Date of the MSA, in breach of the MSA and MOA;

    (vii)  failing to respond to reasonable and unambiguous requests for information from SG Blocks concerning its fulfillment and performance of its obligations under the MSA;

    (viii) raising specious and baseless claims of "confidentiality" with respect to its authorized distributors;

    (ix)   failing to realize the sale of a single test from the Consigned Product from its Direct Pipeline of 6-7 million of orders as represented below:

### Osang Direct Pipeline – Key Current Accounts

**OHC** OSANG HEALTHCARE

| Entity | # of Tests Sold or committed to | Probability of Repeat Order |
|---|---|---|
| FEMA | 300k ( 0) | 100% - FEMA's approved vendor |
| Gvt. Of Argentina | 100k / month – ongoing & indefinite Ramping up to 400k /month Nov-1 | 100% |
| **State of Sao Paolo,  Butantan** | 1.2m - sold 7 million PO signed with MoH **3 Million allocated to Osang** | **100%** |
| State of Minas Gerais, Brazil | 100k - sold | 50% |
| Federation of Paraguay | 250k – sold **2 million –signed - POs** | |
| Federation of Columbia | 100k / month **900k pending - indefinite** | 100 % |
| Federation of Mexico | 100k / month Indefinite | 100% |
| Federation of Venuzuela | 100k - pilot | |
| Atlas Labs, State of Washington | 10k pilot 100k / day Lab Network !!! Agreements in Preparation | 95% |
| ATC Health (confidentially Walmart) – 7 million tests | Waiting for FAST | 100% |
| RTC Medical  / Foley Law Group – PO Sent | 2.5 Million Order | 95% |
| TOTAL Outstanding Commitments | 6-7 Million | |

Stri

(x)     failing to realize the sale of a single test from the Consigned Product from its distributor AHM's confirmed sale orders for 1.4 million units, as represented below:



### AHM – Key <u>Current</u> Accounts – Closed Deals Only

**OHC** OSANG HEALTHCARE

| Entity | # of Tests Sold/ Committed (remaining) | Probability of Repeat Order |
|---|---|---|
| Acme GENOMICS, Salinas, CA – Lab Sale | 24k (20k) | High |
| EccoLabs, Miami, FL - Lab Sale | 120k (100k) | High |
| Fresno Hospital, CA – IDN Sale | 25k (25k) | High |
| Providence Hospital Network, Anaheim, CA  – IDN Sale | 180k ( 90k) | High |
| Rochester labs – Lab Sale  - Lab Sale | 120 k ( 80k) | High |
| Integrity Sciences, San Diego, CA - LabSale | 30 k (20k) | High |
| Precision Labs, Dallas TX – Lab Sale | 120 k ( 60k) | High |
| Hennepin County, MN | 240k ( 152k) | high |
| Ascunsion Labs, Paraguay | 240k ( 228k) | High |
| State of Alaska, Beechtree Lab, AK | 180k ( 142.5 k) | High |
| DC3 Therapeutics, SF, California | 240k ( 152 k) | High |
| Nationwide Labs, Boca Raton, FL – Lab Sale | 90k (42.75k) | High |
| Providence Hospital Network ( other regions – OR, WA, MT) | 300k (285k ) | High |
| **TOTAL Outstanding Commitments** | **(1.4 M)** | |

Strictly Confidential                                                  © OSANG HEALTHCARE. All rights reserved

(xi)    failing to realize the sale of a single test from the Consigned Product from its distributor Elitech's confirmed sale orders for 750,000 units, as represented below:

Elitech – Key Current Accounts

**OHC**
OSANG HEALTHCARE

| Entity | # of Tests Sold or committed to | Probability of Repeat Order |
|--------|--------------------------------|----------------------------|
| Elitech Ingenious - USA | 450 k – sold to date<br>450 k – committed | |
| Elitech Canada | 50k – sold to date<br>300 k – committed | |
| Elitech South Americas | 50k - pilot | |
| Total Outstanding | 750 k | |

Strictly Confidential

© OSANG HEALTHCARE. All rights reserved

(xii)    entering into a "Manufacturing and Supply Agreement" with Nexus Dx, Inc. while it was contractually obligated and bound to do the very same thing with SG Blocks under the MSA and MOA.

106.    As a direct and proximate result of the aforementioned breaches, SG Blocks has been damages in an amount to be proven at trial, but believed to be no less than $2 million and as much as $15 million.

**SECOND COUNT**
**(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**

107.    Plaintiff realleges paragraphs 1 through 106 as if repeated verbatim herein.

108.    It was always understood and agreed that the sale of the Consigned Product would come from Osang's Direct Pipeline and/or the Distributor Pipeline, and that the sale of the entire Consigned Product from those channels was a "certainty."

109.    Osang's acts and omissions directly violated obligations that were presumed to have been intended by the parties, including but not limited to, that the sale of the Consigned Product would come from Osang's Direct Pipeline and/or the Distributor Pipeline

110.    During and throughout the term of the MSA Osang sought to prevent the performance of the MSA or intentionally withheld the benefits thereunder from the plaintiff, including but not limited to by (i) failing to fulfill direct orders (throughout the world) for the Covid-19 Test from the Consigned Product, (ii) failing to require its authorized distributors to fulfill their orders for the Covid-19 Test from the Consigned Product, (iii) refusing to cooperate with or otherwise assist SG Blocks' reasonable requests for information to effectuate sales through Osang's distributors and generally frustrating and preventing the same, (iv) failing to inform SG Blocks that it was negotiating with, and ultimately agreed to enter into a manufacturing and supply agreement with Nexus DV, Inc., (v) failing to inform SG Blocks that it entered into the manufacturing and supply agreement with Nexus DV, Inc., and publicly announced the same in December 2020.

111.   Osang engaged in conduct that prevented, frustrated and injured SG Blocks' right to receive the fruits and benefits of the MSA.

112.    By reason of the foregoing Osang has breached the implied covenant of good faith and fair dealing.

## THIRD COUNT
### (FRAUD)

113.   Plaintiff realleges paragraphs 1 through 112 as if repeated verbatim herein.

114.    Just prior to the execution of the MSA, and in order to induce SG Blocks to enter into same, Osang represented to SG Blocks that it had <u>already secured orders</u> for "6-7 million" Covid-19 Tests from eleven different direct purchasers (i.e. orders received directly by Osang from the purchaser without going through a distributor), the overwhelming majority of which were, as of that time, <u>unfulfilled</u>.

115.   About its Direct Pipeline of sales to eleven different vendors represented Osang represented that there was a "<u>100% probability of a repeat order</u>" with respect to the following purchasers:

| Purchaser | Amount of Confirmed Test Orders |
|---|---|
| (i)   FEMA | 300,000 |
| (ii)  Govt. of Argentina | 400,000 per month |
| (i)   State of Sao Paolo, Butantan | 3,000,000 |
| (ii)  Federation of Columbia | 2,000,000 |
| (iii) Federation of Mexico | 100,000 per month |
| (iv)  Federation of Venezuela | 100,000 |
| (v)   ATC Health/Walmart | 7,000,000 |

116.    Osang further represented to SG Blocks that of the 2.5 million confirmed order of Covid-19 Tests it had already secured from RTC Medical by way of purchase order as of the execution of the MSA, there was a "95% probability of a repeat order."

117.    Just prior to the execution of the MSA, and in order to induce SG Blocks to enter into same, Osang represented to SG Blocks that its authorized distributor AHM had secured orders for 1.4 million Covid-19 Tests from thirteen (13) different customers, 1,071,000 of which were not fulfilled and outstanding as of the date of execution of the MSA.

118.    About the 1.4 million in confirmed orders that Osang represented AHM had as of the execution of the MSA, Osang represented that there was a "High Probability" of a repeat order from each such confirmed customer.

119.    Just prior to the execution of the MSA, and in order to induce SG Blocks to enter into same, Osang represented to SG Blocks that its authorized distributor ELITECH had secured orders for 750,000 Covid-19 Tests from three (3) different customers, all of which were not fulfilled and outstanding as of the date of execution of the MSA.

120.    About the Direct Pipeline and Distributor Pipeline Osang represented that each represented "current and binding accounts of sales to third parties." *See* **Exhibit 2**

121.    About the Direct Pipeline and Distributor Pipeline Osang represented that, **"with existing orders and commitments – not including the extensive pipeline of pending deals that Osang and**

**Distributors have - there is clear visibility and certainty on selling the proposed inventory of 4 million tests in the pipeline."** *See* **Exhibit 2**

122.    The representations by Osang set forth in paragraphs 114-121 (and the Confirmation of Sales Orders generally) were extraneous to the MSA but were intended to induce, and in fact did induce, SG Blocks to enter into the MSA.

123.    The representations by Osang set forth in paragraphs 114-121 (and the Confirmation of Sales Orders generally) were statements of material existing fact that were knowingly and materially false, and were made with the intent to induce and defraud SG Blocks.

124.    At the time that Osang made the representations set forth in paragraphs 114-121 (and the Confirmation of Sales Orders generally) Osang had no intention of performing or fulfilling those promises.

125.    Osang fraudulently misrepresented its then present intention to have Direct Pipeline and Distributor Pipeline sales be fulfilled from the Consigned Product in order to cause SG Blocks to enter into the MSA.

126.    Osang had no intention of having the Direct Pipeline and Distributor Pipeline sales fulfilled from the Consigned Product at the time that it represented to SG Blocks that it would use its best efforts to do so.

127.    SG Blocks justifiably and reasonably relied upon the false and fraudulent misrepresentations of Osang.

128.    But for Osang's false and fraudulent misrepresentations SG Blocks would not have entered into MSA.

129.    As a result of Osang's false and fraudulent misrepresentations, which SG Blocks reasonably and justifiably relied upon, SG Blocks was damaged separate and apart from those suffered as a result of Osang's material breach of contract, including the loss of hundreds of thousands of dollars

expended in order to (i) perform and fulfill its obligations under the MSA and MOA and (ii) enforce the

MSA.

130.    The aforementioned facts demonstrate that Osang engaged in conduct having a high degree

of moral culpability which manifested a conscious disregard of the rights of SG Blocks, or conduct so

reckless as to amount to such disregard.

## FOURTH COUNT
## (INDEMNIFICATION AND ATTORNEYS' FEES)

131.    Plaintiff realleges paragraphs 1 through 130 as if repeated verbatim herein.

132.    Section 12 of the MSA provides:

> OHC agrees to indemnify, defend and hold harmless SGB and SOB's directors, officers,
> employees, agents and affiliates from and against any and all third party claims, suits,
> actions, damages, expenses, costs, fees (including reasonable attorney's fees) and liabilities
> for any injury or damage arising out of or in connection with OHC's performance under
> this Agreement, but not for any such claims, suits, actions, damages, expenses, costs, fees
> or liabilities caused by SOB's gross negligence or willful misconduct. The indemnification
> obligations in this paragraph and Section 13 shall survive any termination of this
> Agreement.

133.    As a direct result of Osang's breach of contract, bad faith and/or fraud, SG

Blocks has been injured and damaged in an amount to be proven at trial.

134.    Pursuant to Section 12 of the MSA Osang must indemnify and hold SG Blocks

harmless from all injuries and damages arising out of the MSA and its breach of contract, bad

faith and/or fraud, including reimbursing SG Blocks for its attorneys' fees and costs of litigation.

## FIFTH COUNT
## (ACCOUNTING)

135.    Plaintiff realleges paragraphs 1 through 134 as if repeated verbatim herein.

136.    Section 13 of the MSA provides:

> Audit. Each Party shall maintain all records and accounts pertaining to this Agreement for
> a period of at least four ( 4) years from the date of final payment under this Agreement or

for such period as required by law. Upon consent, each Party may audit, copy and inspect said records and accounts of the other pertaining to this Agreement at the inspecting Party's expense during normal business hours during the course of the term of this Agreement and for the above four ( 4) year period or such period as required by law, whichever period is longer.

137.    SG Blocks is entitled to an accounting from Osang for all records and accounts pertaining to the MSA, including but not limited to documents concerning all sales, purchase orders, shipping receipts, bills of lading, contracts, and vendors concerning the offering for sale, and sale, of the Covid-19 Tests, including but not limited to sales and purchase orders covered by the Direct Pipeline and the Distributor Pipeline.

138.    SG Blocks is entitled to an accounting from Osang regarding the manufacturing and supply agreement between Osang and Nexus DX, including records and accounts pertaining to the manufacturing, distribution and sale of products  by and among Osang, Nexus and third party purchasers/distributors pursuant thereto.

## SIXTH COUNT
### (VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW §349 – UNLAWFUL AND DECEPTIVE TRADE PRACTICES – DAMAGES AND ATTORNEYS' FEES)

139.    Plaintiff realleges paragraphs 1 through 138 as if repeated verbatim herein.

140.    The MSA is covered by §349 of the New York General Business Law.

141.    Osang, through its Chairman Lee, acknowledged that the business relationship with SG Blocks was intended to benefit the American consumer and general public, and to provide a much needed product during an unprecedented global pandemic, stating:

"We view SG Blocks and Grimshaw as ideal partners to broaden distribution of our advanced tests and expand our ability to directly address this global pandemic in the USA. Our pipeline is substantial, we believe Grimshaw's commitment to sustainable, flexible design solutions combined with SG Blocks modular construction expertise has the ability to address logistical challenges."

"We are delighted with the SGB partnership and see this as a prelude to yet closer collaboration as we explore the expansion of operations and localized manufacturing in the

USA," commented Dong-Hyun Lee, Chairman & Chief Executive Officer of OSANG Healthcare Co., Ltd. "This should greatly improve the speed and efficiency by which we roll-out exciting new products optimized for these markets - not least in the short-term our combination Covid-19/Influenza A&B Test which the US Government has deemed of critical importance as we move into the winter season."

*See* Exhibits 8 and 20.

141.   The actions and omissions of Osang described herein constitute unlawful and deceptive trade practices in connection with the marketing, sale and distribution of a consumer product.

142.   The fact that Osang exploited a global pandemic as an integral component of its fraudulent and deceptive trade practices renders such conduct particularly egregious and culpable.

143.   As a result thereof Plaintiff is entitled to damages and award of attorneys' fees pursuant to GBL §349(h).

**WHEREFORE**, Plaintiff, SG Blocks, Inc. seeks judgment in its favor and against Defendant, Osang Healthcare Ltd., Co., as follows:

A.   Awarding SG BLOCKS compensatory damages;

B.   Awarding SG BLOCKS consequential and incidental damages;

C.   Awarding SG BLOCKS recoupment of proceeds realized by Osang and Nexus DX from the manufacturing and supply agreement between said parties;

D.   AWARDING SG BLOCKS an accounting, and directing Osang to account for (i) all sales, purchase orders, shipping receipts, bills of lading, contracts, and vendors concerning the offering for sale, and sale, of the Covid-19 Tests, including but not limited to an accounting of all sales made by and through the Direct Pipeline and the Distributor Pipeline, (ii) the manufacturing and supply agreement between Osang and Nexus DX, including records and accounts pertaining to the manufacturing,

distribution and sale of products by and among Osang, Nexus and third party

purchasers/distributors pursuant thereto.

D.   Awarding SG BLOCKS punitive damages;

E.   Awarding SG BLOCKS pre-judgment and post-judgment interest pursuant to C.P.L.R

§5001, *et. seq.*;

F.   Awarding SG BLOCKS contractual and statutory attorneys' fees and costs of suit;

and

G.   Awarding SG BLOCKS such other and further relief as the Court deems just and

proper.

Dated: New York, New York
       April 14, 2021

RUTA SOULIOS & STRATIS LLP
Attorneys for SG BLOCKS, INC.

By: _____

Steven A. Soulios, Partner
Joseph A. Ruta, Partner
211 E. 43rd Street, 24th Floor
New York, New York 10017
(212) 997-4500